UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                             :

JOHN DELANEY,                          :

                           :

                    Plaintiff,      :         11 Civ. 8151 (PAE)

                           :

            -v-                :         <u>OPINION & ORDER</u>

                           :

BANK OF AMERICA CORPORATION and BANK OF  :
AMERICA MERRILL LYNCH,           :

                           :

                  Defendants.    :

                           :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff John Delaney brings suit against Bank of America Corporation and Bank of

America Merrill Lynch f/k/a Banc of America Securities, LLC (collectively, "Bank of America"

or "BoA"), alleging that BoA (1) violated the Age Discrimination in Employment Act of 1967

("ADEA), 29 U.S.C. § 621, by terminating him; and (2) breached an oral agreement allegedly

made with him in 2010, when he transferred to a different business unit within BoA.  BoA

moves for summary judgment.  For the reasons that follow, BoA's motion is granted.

**I.**     **Background**[1]

      **A.**     **Delaney's Employment at Bank of America**

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions
in support of and in opposition to the instant motion—specifically, the Affirmation of Patrick J.
Lamparello ("Lamparello Aff.") (Dkt. 28) and attached exhibits; the Affirmation of Steven
Hollender ("Hollender Aff.") (Dkt. 29); the Declaration of Jonathan Honig ("Honig Decl.") (Dkt.
36) and attached exhibits; the Declaration of John Delaney ("Delaney Decl.") (Dkt. 35) and
attached exhibits; the Reply Affidavit of Patrick J. Lamparello ("Lamparello Reply Aff.") (Dkt.
33) and attached exhibits; Defendant's Local Rule 56.1 Statement of Material Facts ("Def. 56.1")
(Dkt. 27); and Plaintiff's Local Rule 56.1 Statement of Material Facts ("Pl. 56.1") (Dkt. 39).
Citations to a party's 56.1 statement incorporate by reference the documents cited therein.

In 1996, Delaney began working for NationsBank, a predecessor company to BoA, in the High Yield Sales Group ("High Yield").  Lamparello Aff. Ex. A (Deposition of John Delaney) ("Delaney Dep.") at 11.  After a merger with BoA in 1998 or 1999, Delaney continued working in High Yield.  *Id.* at 17–20.

In 2006, Delaney was transferred to a newly-formed group, the Fixed Income Middle Markets Sales Group ("Middle Markets"), where he continued to sell high-yield products, but worked under new managers.  Pl. 56.1 ¶ 8; Delaney Dep. 25–26.  In Middle Markets, Delaney's compensation included a commission based on a percentage of his production revenue.  Pl. 56.1 ¶ 12; Def. 56.1 ¶ 12.[2]  In January 2009, BoA acquired Merrill Lynch & Co., Pl. 56.1 ¶ 15; Def. 56.1 ¶ 15, and Amy Ellis-Simon became the manager of Middle Markets, Pl. 56.1 ¶ 16; Def. 56.1 ¶ 16.  In 2009, while in Middle Markets, Delaney's commissions exceeded $1.6 million.  Delaney Decl. ¶ 4.  That same year, his performance review from Middle Markets was positive, and included a rating of "exceeds/meets," the second-highest rating.  Delaney Decl. ¶ 1; Delaney Decl. Ex. 1.

In March 2010, Delaney was transferred back to High Yield, Delaney Dep. 42; Pl. 56.1 ¶ 31; Def. 56.1 ¶ 31, where his salary was to be based on a salary-plus-bonus model.  Delaney Dep. 47.  At the time, Jeff Fortgang was the head of High Yield.  Lamparello Aff. Ex. D (Deposition of Jeffrey Fortgang) ("Fortgang Dep.") at 7–8.  Steve Hollender and Gerald Walker were co-heads of Credit Sales, which encompassed High Yield, as well as other sales groups.  Lamparello Aff. Ex. B (Deposition of Steven Ira Hollender) ("Hollender Dep.") at 11–13.

---

[2] Plaintiff's submissions are inconsistent about whether his compensation consisted of a commission plus a salary or only a commission.  *Compare* Delaney Dep. 27–32 *with* Pl. 56.1 ¶ 12, *and* Delaney Decl. ¶ 3.  This discrepancy, however, is not material to the Court's analysis.

In connection with his transfer back to High Yield, Delaney met with Ellis-Simon, Hollender, and Fortgang to discuss the move. Pl. 56.1 ¶ 37; Def. 56.1 ¶ 37; Delaney Dep. 42–43, 48–49. Delaney states that he voluntarily transferred to High Yield in consideration for an oral promise by these managers regarding the number and/or nature of the accounts he would be assigned in that unit. Delaney Decl. ¶ 11. In his second claim in this lawsuit, for breach of contract, Delaney asserts that BoA broke that promise. Delaney Decl. ¶¶ 11–14. The evidence relating to this alleged oral promise is reviewed in detail *infra*, at 22–30.

In July 2010, Delaney received a negative mid-year review. Delaney Decl. Ex. 4. In August or September 2010, BoA began a reduction in force ("RIF"), in which it broadly evaluated the company's operations with the goal of terminating underperforming employees. Hollender Dep. 81–83; Lamparello Aff. Ex. F (Deposition of Claudine Marie Rippa) ("Rippa Dep.") at 23–24, 27–28. In September 2010, Delaney was terminated. Delaney Decl. ¶ 20; Pl. 56.1 ¶ 77; Def. 56.1 ¶ 77. BoA informed him that he had been terminated as part of the RIF. Delaney Dep. 68–69. In contemporaneous internal emails, BoA officials stated that their selection of Delaney as a person to be terminated as part of the RIF was based on negative performance reviews and low production. *See, e.g.*, Honig Decl. Ex. 11, at BASJD 00213.

At the time he was terminated, Delaney was 56 years old. He was the oldest member of High Yield, and was the only member of High Yield to be terminated. Delaney Decl. ¶ 20.

### B. Delaney's Complaint

On November 10, 2011, Delaney filed the Complaint in this case. Dkt. 1.[3] Delaney brings two claims. The first is for discrimination in violation of the ADEA: Delaney alleges that

---

[3] Delaney originally filed the contract claim with FINRA, pursuant to a mandatory arbitration agreement. After he brought the ADEA claim in this Court, BoA asked FINRA to dismiss the claim under FINRA Code of Arbitration Rule 13803, so that it could be litigated in this Court

BoA discriminated against him on the basis of age when it terminated him in September 2010. The second is for breach of contract:  Delaney alleges that BoA breached an oral agreement to provide him with sufficient accounts in High Yield to enable him to obtain compensation in 2010 equal to his compensation in 2009.

On August 17, 2012, BoA moved for summary judgment as to both claims.  Dkt. 25–29. On September 14, 2012, Delaney filed his opposition.  Dkt. 35–38.  On October 5, 2012, BoA filed its reply.  Dkt. 32–33.  On November 7, 2012, the Court heard oral argument on the motion.

## II.   Discussion

### A.  Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will

---

alongside the factually related ADEA claim.  Pl. Br. 24–25; Transcript of Oral Argument ("Tr.") at 12–14, 20.

preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

In the context of the ADEA, the Second Circuit "has repeatedly emphasized 'the need for caution about granting summary judgment to an employer . . . where, as here, the merits turn on a dispute as to the employer's intent.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb*, 521 F.3d at 137). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations and 'set forth specific facts showing that there is a genuine issue for trial.'" *Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 21 (2d Cir. 2011) (summ. order) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 224 (2d Cir. 2006)). To survive a motion for summary judgment, therefore, a plaintiff must do more than merely create "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B.     Delaney's ADEA Claim

Under the ADEA, it is unlawful "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). In analyzing a claim of age discrimination, courts in this circuit employ the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Gorzynski*, 596 F.3d at 105–06. Under that framework, a plaintiff "bears the initial burden of establishing a *prima facie* case of discrimination." *Id.* at 106 (citing *McDonnell Douglas*, 411 U.S. at 802). "If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Defendants' burden, however, is "one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods.*, 530

U.S. 133, 142 (2000).  "Once such a reason is provided, the plaintiff can no longer rely on the *prima facie* case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination."  *Gorzynski*, 596 F.3d at 106.  Pursuant to *Gross v. FBL Financial Services, Inc.*, "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."  557 U.S. 167, 180 (2009).  Age cannot have been "just a contributing or motivating factor," but must indeed have been the "but-for cause."  *Gorzynski*, 596 F.3d at 106; *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.2 (2d Cir. 2009).

Here, BoA argues that:  (1) Delaney has not made out a *prima facie* case because he has not adduced facts that give rise to an inference of age discrimination; and, alternatively, (2) BoA has identified a legitimate, non-discriminatory reason for his termination—the RIF—which Delaney has failed to show is pretextual.  Def. Br. 1.  The Court considers these arguments in turn.

### 1.     *Prima Facie* Case

To establish a prima facie case of discrimination under the ADEA, Delaney must demonstrate that: (1) he was within the protected group of employees (those over age 40); (2) he was qualified for the position in question; (3) he experienced an adverse employment action; and (4) that action occurred under circumstances giving rise to an inference of discrimination. *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (citing *Gorzynski*, 596 F.3d at 107).

For the purposes of this motion, it is undisputed that Delaney makes out the first three elements:  He (1) is over age 40; (2) was qualified for his position; and (3) was subject to an adverse employment action, *viz.*, termination.  Tr. 2, 28.

As to the fourth element—whether the circumstances give rise to an inference of age discrimination—Delaney predominantly relies on the fact that he was the oldest member of High Yield.  He further argues that an inference of age discrimination can be drawn from (1) the fact that older employees from other groups were also terminated; (2) the fact that his work and accounts were re-distributed to younger workers; and (3) evidence which he claims shows that BoA has otherwise demonstrated a pattern of discriminatory animus.  The Court addresses these factors in turn.

Delaney first argues that because he was the oldest member of the High Yield Sales Group and the only person terminated in that group, an inference of age discrimination arises. Pl. Br. 16.  BoA responds that the fact that Delaney was the oldest member of High Yield at the time he was terminated does not, alone, make out a *prima facie* case of age discrimination.  Def. Br. 11–12.  On that point, BoA is correct.  *See Vargas v. Manhattan & Bx. Surface Transit Operating Auth.*, No. 08 Civ. 9254 (AKH), 2010 WL 1783555, at *5 (S.D.N.Y. Apr. 30, 2010) ("That [plaintiff] was the oldest [employee] at the [duty station] does not support an inference of discrimination."); *Holowecki v. Fed. Express Corp.*, 644 F. Supp. 2d 338, 355 (S.D.N.Y. 2009) ("[Plaintiff's] bald assertion that she was the oldest courier in her station is insufficient to give rise to inference of age discrimination."), *aff'd*, 382 F. App'x 42 (2d Cir. 2010) (summ. order); *see also Payne v. Malemathew*, No. 09 Civ. 1634 (CS), 2011 WL 3043920 (S.D.N.Y. July 22, 2011) (dismissing complaint where "plaintiff here has pleaded nothing beyond the fact that he was the oldest employee in his department and was let go").

Delaney next argues that age discrimination can be inferred because two other ADEA-covered employees in *other* groups at BoA were also laid off in 2010.  Pl. Br. 10, 16.  It is undisputed that these employees, Jack Hobson and Patrick Downey, from Middle Markets and

the Distressed Sales group, respectively, were terminated in spring 2010 and September 2010, respectively.  Delaney Decl. ¶¶ 18–19; Delaney Dep. 73–75.  But Delaney has not offered any evidence as to the circumstances of these terminations.  The record before the Court does not reflect, for example, whether other employees were also terminated in these groups; whether the persons who decided upon these terminations were the same who approved Delaney's; whether Hobson and Downey were replaced by younger workers; or what BoA's stated justification was for terminating them.[4]  Simply put, the mere fact that Delaney has identified two other older employees within BoA who were terminated in 2010 does not support an inference of discrimination.

Next, Delaney argues that following his termination, his work was "definitionally given to the other, younger members of the High Yield Sales Group."  Pl. Br. 14.  It is true that, where an ADEA-covered employee is replaced by a younger worker, that is generally sufficient to infer discrimination and make out a *prima face* case.  *See, e.g.*, *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 660 (2d Cir. 2009) (summ. order).  Here, however, Delaney has not come forward with evidence that he was in fact replaced.  Although his work may have been divvied up among the remaining members of High Yield, all of whom were, as a matter of fact, younger, *see* Honig Decl. Ex. 4, Delaney has presented no evidence that anyone else, younger or older, was hired or promoted to fill his spot.  This unexceptional circumstance is insufficient to create an inference of discrimination.  *See, e.g.*, *Patterson v. J.P. Morgan Chase & Co.*, No. 01 Civ. 7513 (LMM), 2004 WL 1920215, at *4–5 (S.D.N.Y. Aug. 26, 2004) (finding no *prima facie* case where oldest employee in an office was terminated, but not replaced).

---

[4] To be sure, there is a factual dispute about whether Hobson and Downey reported to the same managers as did Delaney.  *See* Def. 56.1 ¶ 90; Pl. 56.1 ¶ 90.  Even assuming that this was the case, however, Delaney has not offered sufficient evidence of the circumstances of their terminations to give rise to an inference of discrimination.

Delaney finally broadly claims that there was a "pattern of discriminatory animus" at BoA. Pl. 56.1 ¶ 86; *see also* Pl. Br. 12, 14. In support of this claim, he asserts that (1) BoA engaged in a "covert" "campaign" against C.G.,[5] the next-oldest person in High Yield, Pl. Br. 12; and (2) a BoA manager who had been involved in an ADEA lawsuit while at a previous employer "was at the center of the discrimination that occurred here," Pl. Br. 1. Delaney does not, however, support either claim with admissible evidence.

First, as to C.G., the second-oldest member of High Yield, it is undisputed that he was terminated in March 2011, six months after Delaney. Delaney Dep. 75. BoA has asserted that C.G.'s termination resulted from a RIF. *See* Hollender Ex. 2. Delaney argues that, in fact, C.G.'s termination resulted from age discrimination, and that even though C.G. was terminated later than Delaney, his termination is probative here because it shows that the High Yield managers "decided to 'get' the old guys." Pl. Br. 11.

Delaney's basis for claiming that C.G. was a victim of age discrimination is a single document—a draft EEOC charge, which C.G. submitted to BoA in 2011. *See* Honig Decl. Ex. 16. In that draft charge, C.G. claimed that he had been terminated due to age discrimination. In the draft charge, C.G. also claimed that colleagues and managers had made remarks to him indicative of age bias.[6] *Id.* ¶ 11. Delaney, however, has developed no other evidence whatsoever relating to C.G. or the circumstances surrounding C.G.'s termination. Delaney did not, for example, depose C.G. Nor did he seek to obtain a sworn declaration from C.G. attesting to the facts surrounding his termination. At argument, Delaney's counsel conceded that he made an elective decision in discovery not to depose C.G. or to develop such facts. Tr. 36–38.

---

[5] The Court uses C.G.'s initials, rather than his full name, in order to respect his privacy.

[6] In contrast, Delaney testified that he does not recall any comments being made to him by anyone about his age. Delaney Dep. 76.

As evidence, however, the draft charge that C.G. transmitted to BoA is inadmissible, because it is classic hearsay—an out-of-court statement which Delaney proposes to offer for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). The draft charge is, at best, tantamount to a complaint—a document reciting a witness's allegations. And it is well-settled that such a document may not be admitted to prove those allegations. *See In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ("As the Second Circuit held, a complaint is not admissible to prove the truth of its contents." (citing *Stevenson v. Hearst Consol. Publ'ns, Inc.*, 214 F.2d 902, 907 (2d Cir. 1954))).

Because the draft charge is inadmissible, it is also not cognizable in making a determination at summary judgment whether a *prima facie* case exists. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("'[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'" (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)); *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) ("The evidence considered on summary judgment must generally be admissible evidence."); *Raskin*, 125 F.3d at 66 ("The principles governing admissibility of evidence do not change on a motion for summary judgment. Rule 56(e) provides that affidavits in support of and against summary judgment "shall set forth such facts as would be *admissible in evidence.*" (emphasis in original) (quoting Fed. R. Civ. P. 56(e))); *S.E.C. v. Espuelas*, No. 06 Civ. 2435 (PAE), 2012 WL 5288738, at *9–11 (S.D.N.Y. Oct. 26, 2012) (collecting cases).

At argument, Delaney argued on two grounds that C.G.'s charge was admissible. Neither argument is persuasive. First, Delaney argued, C.G.'s charge is a business record, admissible under, presumably, the hearsay exception for records of regularly conducted activity. *See* Fed.

R. Evid. 803(6); Tr. 32–34.  But that is wrong.  Rule 803(6) allows a hearsay record to be admitted for the truth of the matter asserted if "the record was made at or near the time by . . . someone with knowledge; the record was kept in the course of a regularly conducted activity of a business . . .; [and] making the record was a regular practice of that activity . . . ."  Fed. R. Evid. 803(6)(A)–(C).  The draft charge is not a business record of BoA's:  Delaney has not claimed, let alone shown, that BoA has a regular practice of creating or maintaining draft complaint letters to the EEOC about its conduct.  *See Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995) ("[T]he proffered record must be supported by a proper foundation, namely, that the document was 'kept in the course of a regularly conducted business activity' and also that it was the 'regular practice of that business activity to make the [record].'" (citation omitted)).  C.G.'s draft charge, on its face, was created by C.G., not BoA, which was its recipient.[7]  As for C.G., even if C.G. could otherwise qualify as the creator of a business record, the draft charge, on its face, was created by C.G. in anticipation of filing an EEOC complaint—an inherently isolated, singular event.  *See United States v. Strother*, 49 F.3d 869, 876 (2d Cir. 1995) ("We are reluctant to adopt a rule that would permit the introduction into evidence of memoranda drafted in response to unusual or isolated events, particularly where the entrant may have a motive to be less than accurate." (citation omitted)); *see also* Fed. R. Evid. 803 advisory committee's notes ("Absence of routineness raises lack of motivation to be accurate.").  Finally, the draft charge lacks "'sufficient indicia of trustworthiness to be considered reliable,' and to warrant admissibility as

---

[7] It is no response to posit that BoA may have a regular practice of maintaining draft EEOC charges that it receives (although Delaney has not even adduced evidence of this point).  There is no suggestion that BoA (or Delaney) has a "regular practice" of making such records.  *See* Fed. R. Evid. 803(6).  And Delaney offers no authority supporting the counterintuitive notion that a draft charge generated by a former employee is a business record of a company.  Were this the case, any negative or complaint letter retained by a business pursuant to a regular retention practice would be admissible against the company for the truth of the matter asserted.  That is assuredly not the law.

business records." *See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632–33 (2d Cir. 1994) (quoting *Saks Int'l, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987)).  In the form submitted to BoA, the draft charge is fairly viewed as an advocacy submission, attempting, presumably, to achieve a settlement of C.G.'s employment dispute.

Alternatively, Delaney argues that C.G.'s draft EEOC charge is admissible not to prove the truth of C.G.'s allegations of age discrimination, but to show BoA's state of mind.  Tr. 35–36.  But BoA's state of mind in March 2011, eight months *after* Delaney's termination, is irrelevant to this dispute.  C.G.'s letter could assist Delaney at summary judgment only if it were admissible for the truth of the matters asserted, and it is inadmissible for that purpose.

In a separate argument aimed at showing a pattern of discrimination, Delaney relies on *Weiss v. JPMorgan Chase & Co.*, No. 06 Civ. 4402 (DLC), 2008 WL 216619 (S.D.N.Y. Jan. 22, 2008), *rev'd*, 332 F. App'x 659 (2d Cir. 2009) (summ. order), which involved a claim of age discrimination against, among others, Bryan Weadock, a then-JPMorgan Chase ("JPMC") manager, who later transferred to BoA and was one of Delaney's supervisors at the time he was terminated.  At BoA, Weadock was the manager of Fixed Income Sales, which encompassed the High Yield group.  Delaney notes that, in *Weiss*, following a grant of summary judgment for JPMC, the Second Circuit reinstated the plaintiff's claim of age discrimination, on grounds that included that fact that Weadock, the primary decision-maker, had given shifting explanations for Weiss's termination.  332 F. App'x at 663.  Based on the *Weiss* decision, Delaney argues that Weadock "has been shown to have discriminatory animus."  Pl. Br. 9–10, 16–18.

But the decision in *Weiss* does not establish a pattern of discrimination at BoA.  First, the Second Circuit did not find that Weadock actually *had* discriminatory intent.  Instead, it held only that, on the evidence at hand, JPMC's intent—based on all relevant evidence, not just

Weadock's shifting explanations—was a question for a jury and could not be resolved on summary judgment. *See* 332 F. App'x at 665 ("[W]e cannot confidently say that no rational factfinder could determine that JPMorgan's reasons for terminating Weiss were pretextual."). Nor was any such finding ever made in *Weiss*: Following remand, the case settled. *See* No. 06 Civ. 4402 (DLC), Dkt. 61. The allegations in *Weiss*, therefore, are just that—allegations. Further, Weadock's shifting explanations as to the termination of a different employee while working for a different employer, JPMC, are a far cry from admissible evidence that (1) BoA has a pattern of age discrimination, or (2) that Weadock or BoA engaged in age discrimination as to Delaney. *See Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, No. 09 Civ. 9662, 2012 WL 2333303 (S.D.N.Y. June 19, 2012) ("Reference to other claims asserted against the Defendant are unproven allegations and do not establish pretext for age or gender discrimination.").[8]

In the end, Delaney is left with the fact that he was the oldest employee of High Yield and the only one terminated. But, as noted, as a matter of law, that alone is insufficient to make

---

[8] Also unpersuasive is Delaney's contention that the Second Circuit's analysis in *Weiss* precludes a grant of summary judgment here. Delaney argues: "*Weiss* is on all fours with the instant matter except that there is far more evidence of discrimination here than was present there." Pl. Br. 17. But Delaney is wrong that there is more evidence of age discrimination here than in *Weiss*. The opposite is true: Weiss was replaced by another employee who was 16 years younger than he; he had superior qualifications to his replacement; JPMC had offered "shifting" and "inconsistent" explanations for his termination; in terminating Weiss, JPMC had deviated from its internal policies; and a fair comparator to Weiss had been promoted instead of terminated. 332 F. App'x at 660–64. And there were other factual issues that potentially might have supported the terminated employee's claim, including whether JPMC actually terminated Weiss out of business necessity, as it claimed, and whether its use of the term "energized" as a basis to favor another candidate was a euphemism for "youthful." These factors are absent here. Also undermining Delaney's embrace of the legal analysis in *Weiss* is the fact that the Supreme Court's decision in *Gross*, decided 13 days after *Weiss*, *heightened* the plaintiff's burden in ADEA cases. The Court held that a plaintiff must show "that age was the 'but-for' cause of the challenged adverse employment action," and not just that it was a motivating or contributing factor. *Gross*, 557 U.S. at 180.

out a *prima facie* case of age discrimination.  Based on the admissible evidence before the Court, no "fair-minded jury" could find that Delaney's termination occurred under circumstances giving rise to an inference of discrimination based on age, without engaging in "unsubstantiated speculation." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553–54 (2d Cir. 2005) (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)); *see also id.* ("At the summary judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998))).

### 2.        Bank of America's Burden of Production

Even assuming *arguendo* that Delaney had made out a *prima facie* case of discrimination, BoA has met its burden of production by articulating a legitimate, nondiscriminatory reason for his termination:  It has explained—and supported by corroborative documentary and testimonial evidence that Delaney does not counter—that it terminated Delaney as part of a reduction in force ("RIF"), and that Delaney was selected for the RIF because he was the lowest performing member of the High Yield Sales Group.

In August or September 2010, BoA began its RIF.  Hollender Dep. 81–83; Rippa Dep. 23–24, 27–28.  As part of the RIF process, Claudine Rippa, the human resources manager for Fixed Income Sales, and others from Human Resources worked with group managers to identify a list of employees to be terminated as part on the RIF.  Rippa Dep. 24.  BoA performed an impact analysis.  *Id.* at 25–26.  From mid-August to mid-September, emails were exchanged, in which managers and others finalized the RIF list, calculated supplemental payments for those employees, and established talking points for how to discuss the RIF with their groups.  *See generally* Honig Decl. Ex. 11.

14

In September 2010, Delaney was terminated.  Delaney Decl. ¶ 20; Pl. 56.1 ¶ 77; Def.

56.1 ¶ 77.  During the RIF process, Hollender and Walker selected him for termination.

Hollender Dep. 92–94, 106–07; Lamparello Aff. Ex. E (Deposition of Gerold Walker) ("Walker

Dep.") at 72–74, 100; *see infra* pp. 19–20 (summarizing evidence why Delaney was chosen for

the RIF).  BoA informed Delaney at that time that he had been terminated as part of the RIF.

Delaney Dep. 68–69.

A RIF is a legitimate, nondiscriminatory reason for termination.  *See Woroski v. Nashua

Corp.*, 31 F.3d 105, 109 (2d Cir. 1994) (holding it sufficient for defendant to "demonstrate that it

discharged [plaintiffs] as part of a business-justified company-wide reduction in force, conducted

on an unbiased basis"); *see also Deebs v. ALSTOM Transp., Inc.*, 346 F. App'x 654, 657 (2d Cir.

2009) (summ. order) ("[T]his Court has long held that ADEA claims arising from the results of a

firm's force reduction will generally not lie where the record 'demonstrate[s] that the

reorganization was a business decision made on a rational basis.'" (quoting *Parcinski v. Outlet

Co.*, 673 F.2d 34, 37 (2d Cir. 1982))); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir.

2000) (evidence of RIF and dissatisfaction with job performance sufficient to rebut *prima facie*

ADEA case); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir.

1994) (same); *Gioia v. Forbes Media LLC*, No. 09 Civ. 6114 (RJS), 2011 WL 4549607, at *6

(S.D.N.Y. Sept. 30, 2011) *aff'd*, No. 11-4406-CV, 2012 WL 5382256 (2d Cir. Nov. 5, 2012).

And BoA has offered evidence that the RIF was a business decision made on a rational basis.

*See* Ellis-Simon Dep. 197–98; Rippa Dep. 24–28, 30; Hollender Dep. 81–83.

Seeking to avoid this line of authority, Delaney argues that the terminations from BoA in

September 2010 were "not a RIF in the meaningful sense of that term."  Pl. Br. 19, 21.  That is

because, he argues, there was no mandate for a specific reduction in the High Yield group; that

is, any terminations in High Yield were undertaken voluntarily.  But the law does not require that

a numerical target for terminations have existed as a predicate to finding a RIF to be a

nondiscriminatory basis for termination, so long as the RIF is business-justified and unbiased.

*Woroski*, 31 F.3d at 109.  Here, there is overwhelming evidence that (1) BoA's impulse in

determining to reduce headcount in High Yield stemmed from a mandate to review the quality of

employees' production, and (2) the choice of Delaney was based on performance factors

unrelated to his age.

In disputing that BoA has met its burden at this step of the *McDonnell Douglas* analysis,

Delaney misstates that burden.  "Defendants' burden at this stage is not to prove

nondiscrimination.  Instead, defendants must 'introduce evidence which, *taken as true,* would

*permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'"

*Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 574 (S.D.N.Y. 2010) (quoting *St.*

*Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis in original)).  BoA has done

so here.

### 3.        Pretext and But-For Causation

Once the defendant has put forward a legitimate, nondiscriminatory reason for a

termination, the plaintiff bears the burden of persuasion:

> "This burden now merges with the ultimate burden of persuading the court that
> [plaintiff] has been the victim of intentional discrimination.  [Plaintiff] may
> succeed in this either directly by persuading the court that a discriminatory reason
> more likely motivated the employer or indirectly by showing that the employer's
> proffered explanation is unworthy of credence."

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Accordingly, to survive a

motion for summary judgment, "at this step, the plaintiff must show that 'a reasonable jury could

conclude by a preponderance of the evidence that [the plaintiff's] age was a 'but for' cause of

[the adverse employment action].'"  *Timbie*, 429 F. App'x at 22 (alterations in original) (quoting *Gorzynski*, 596 F.3d at 107).

Important here, in determining whether the articulated reason for the action is a pretext, "a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable.  Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993).  "In other words, 'a reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.'"  *Wolf*, 2012 WL 4336232, at *9 (quoting *Hicks*, 509 U.S. at 515).

In seeking to show pretext, Delaney first argues, as before, that BoA's was not a "true" or pure RIF, in that "[t]here was no mandate for any reduction in force in the High Yield Sales Group," and that selecting him was a "totally voluntary action" by Delaney's managers.  Pl. Br. 19–21.  But whether a termination within High Yield was discretionary does not make BoA's RIF explanation pretextual, any more than a decision to include an older employee in a mandatory RIF on account of his age would make such an action lawful.  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) ("Even within the context of a legitimate reduction-in-force, . . . an employer may not discharge an employee 'because' of his age." (citing *Gallo*, 22 F.3d at 1226))).  Whether a termination in a business unit was mandatory or discretionary, the decisive issue is instead whether the plaintiff can "demonstrate, at least in his individual case, that the reduction-in-force and the allegation of poor performance are actually a pretext and that the real reason for his discharge was his age."  *Id.*  The fact that High Yield was not obliged to terminate an employee does not show such pretext.  "Plaintiff's complaints about

17

the lack of 'formal' RIF plans . . . are no more than disagreements with Defendant's process for planning the RIF and provide no evidence of discriminatory intent or pretext."  *Zito*, 2012 WL 2333303, at *13.

Moreover, contrary to Delaney's suggestion that the RIF was in some sense fictive, the evidence uniformly shows that BoA was terminating people in September 2010 through a process that personnel repeatedly referred to as a RIF.  *See, e.g.*, Honig Decl. Ex 11, at BASJD 001949 ("[W]e have rolled up the rif data . . . .); Delaney Dep. 69 ("Q:  Did anybody at Bank of America ever tell you why you were being laid off? . . . A:  That morning either Jerry Walker or the person that came down from personnel explained that it was a reduction in force.").  Further, although Delaney was the only employee within High Yield who was terminated at the time, a total of 418 BoA employees from across the company were listed for inclusion in the September 2010 RIF process.  Honig Decl. Ex 11, at BASJD 001948; Hollender Dep. 81—83 (discussing "bank-wide RIF" "in the number of hundreds of people").[9]  Although there was no announced quota or savings goal, Rippa Dep. 24, 27, Rippa testified that managers were instructed to consider production and performance in deciding whom to put on the RIF, *id.* at 30; *see also* Hollender Dep. 83 (stating that he focused on "underperformers").

Furthermore, BoA has articulated and substantiated its nondiscriminatory, performance-based reasons for choosing Delaney to terminate.  It has presented uncontradicted testimony from the decision-makers that Delaney was chosen for termination because of his low mid-year performance review in June 2010.  *See* Hollender Dep. 106–08 (testifying that he considered mid-year reviews in determining which employees were underperforming and whose termination would have least impact on business); Walker Dep. 73–78, 82–83 (recalling conversations, in

---

[9] RIFs were used in BoA throughout 2009–2010, and nine employees in High Yield were terminated over that period.  Honig Decl. Ex. 4; Hollender Aff. Ex. 2.

connection with the RIF process, with Hollender and trading desk regarding Delaney's weaknesses).  The comments on Delaney's mid-year review confirm that his new managers in High Yield were dissatisfied with his work.  Delaney Decl. Ex. 4.  And BoA's internal RIF documents clearly state that Delaney was chosen for termination for these reasons.  *See* Honig Decl. Ex. 11, at BASJD 002013 ("negative feedback from traders, hasn't made transition to being an institutional sales person from a middle market sales person; production is low").

Although Delaney contends that his supervisors rushed to judgment and that a more fair process would have given him additional time to prove his ability to produce in his second tour of duty in High Yield, Delaney has not presented any evidence that his supervisors based their termination decision on his age, or, for that matter, on anything other than their assessments of his production and performance.  *See Chuang v. T.W. Wang Inc.*, 647 F. Supp. 2d 221, 234 (E.D.N.Y. 2009) ("Inevitably, in the course of a restructuring, employers must choose among employees as to who will be terminated.  In so doing, it is both lawful and consistent with common sense for an employer to choose employees . . . whose performance and qualifications are lacking relative to other employees.").[10]

Delaney's critiques of his 2010 mid-year performance review are insufficient to show that it was a pretext for terminating him on the basis of his age.  The 2010 mid-year review states that Delaney's "overall production is down -7% YTD" and he "should cover less accounts"; it also notes that "John talks about getting bigger accounts but we need to make sure the desk

---

[10] Also unavailing to show pretext is Delaney's claim that BoA did not follow its own policies before terminating Delaney.  In particular, Delaney faults BoA for not abiding by a provision stating that "[i]n most cases," where an employee has "a performance problem, your supervisor will give you constructive criticism and an opportunity to improve."  *See* Pl. Br. 11, 17; Honig Ex. 15 at 9.3.  But the policies on which Delaney relies are from the employee handbook of BoA's predecessor company, NationsBank.  *See* Honig Ex. 15.  Delaney does not show that BoA failed to follow its own policies.

believes he can handle what he currently has." Delaney Decl. Ex. 4.  In arguing that this review was pretextual, Delaney notes that Hollender and Walker, the co-heads of Credit Sales, could not remember, as of the time of their depositions, which of them had performed Delaney's review. Delaney also seizes on the fact that his mid-year review was undertaken before he had been in High Yield for six months, and that it did not incorporate his positive comments from 2009, when he was in a different group.  Pl. Br. 8.  But these facts do not support a finding that the 2010 review was a pretext to camouflage age discrimination.  And as for Delaney's claim that, "[m]ysteriously, there were no similar reviews for anyone else in the High Yield Sales group," *id.*, it is demonstrably wrong.  The summary judgment record reflects that such reviews were performed:  Exhibit 12 to the Honig Declaration contains the 2010 year-end reviews for all High Yield employees.  Each includes a mid-year periodic review in a similar format to Delaney's.

Finally, Delaney argues that the 2010 review is unworthy of belief because it is more negative than his positive 2009 performance review.  Pl. Br. 20; Delaney Decl. Ex. 1.  But under the circumstances, the 2010 report's more negative evaluation does not suggest a pretext or sham.  Importantly, in 2010, Delaney was in a different group, had different duties, and reported to a different manager than he had in 2009.  And his 2010 mid-year review is consistent with his BoA scorecard from September 2010, which ranked him 136th out of all BoA salespeople for the year.  Lamparello Aff. Ex. O.  Further, as BoA notes, Delaney's performance review for 2010 is more negative than that of any other member of High Yield Sales.  Def. Reply Br. 5 n.4.  Every other employee's mid-year review is stronger; no other mid-year review suggests that the employee cannot handle the workload in High Yield.  *See generally* Honig Decl. Ex. 12.  The other High Yield employees' comparative rankings on their September 2010 BoA scorecards are

substantially higher than Delaney's, ranging from first to 38th, as compared to his 136th. Lamparello Aff. Ex. O.

In a final attempt to show pretext, Delaney, in his deposition, testified that three co-workers should have been laid off before him because their respective performances were worse than his: Matt Schlumberger, Steve Selver, and Jason Bond. Delaney Dep. 92. But the record reveals that each of the three had excellent mid-year performance reviews in 2010, and two had Exceeds/Exceeds ratings at the 2010 year-end review—higher than Delaney's Exceeds/Meets rating from 2009.[11] Honig Decl. Ex. 12. Each also had substantially higher rankings based on production than Delaney. Hollender Aff. Ex. 1.

Accordingly, although Delaney is free to take issue with BoA's assessment of his performance, his disagreement does not, under the circumstances, show that that review was a pretext for age discrimination.

> Although Plaintiff vehemently disagrees with Defendants' assessment of his performance and the decision to select him as one of the two weakest [employees] of the group, this does not show pretext. Indeed, a court "does not sit as a super-personnel department" to review employers' decisions. Furthermore, even if Plaintiff could show that Defendants' rating was incorrect or improper, which he has not, this would be immaterial as long as the decision to terminate Plaintiff was not based on discriminatory animus.

*Pearson v. Lynch*, No. 10 Civ. 5119 (RJS), 2012 WL 983546, at *10–11 (S.D.N.Y. Mar. 22, 2012) (citation omitted); *see also Mattera*, 740 F. Supp. 2d at 576–77 ("Plaintiff's claim that his poor performance reviews were unfounded is equally unavailing."); *id.* (collecting cases); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) *aff'd*, 205 F.3d 1327 (2d Cir. 2000) ("In any event, plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim.").

---

[11] Because Delaney was terminated before a 2010 year-end review, he did not receive a year-end rating for 2010.

For the reasons arrayed above, Delaney has neither "(1) adduce[d] evidence from which a reasonable fact-finder could directly infer that the discriminatory intent more likely motivated the employer than the proffered reason, or (2) show[n] that the proffered explanation is unworthy of credence." *Dressler v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 3769 (JPO), 2012 WL 1038600 (S.D.N.Y. Mar. 29, 2012) (quoting *Burdine,* 450 U.S. at 256).  Even viewing the evidence in the light most favorable to him, Delaney has failed to muster evidence sufficient to permit a reasonable fact-finder to conclude that he would not have been terminated but for his age. Summary judgment on his ADEA claim, accordingly, must be granted to BoA.

### C.  Delaney's Contract Claim

In March 2010, Delaney moved from Middle Markets to the High Yield Sales Group. The parties differ as to the circumstances of the transfer:  Delaney asserts that he moved voluntarily, while BoA asserts that the move was mandatory.  Significant here, Delaney claims that he agreed to transfer groups in exchange for a binding promise orally made to him by BoA, which BoA then broke.

Specifically, Delaney alleges that in exchange for his agreement to transfer from Middle Markets to High Yield, BoA promised to provide him with sufficient institutional accounts to enable him to maintain or exceed his 2009 bonus level of $1.6 million.[12]  BoA breached that agreement, Delaney claims, by failing to provide him with sufficient new clients, and by terminating him without paying him a bonus.  BoA argues that (1) Delaney has not adduced facts on which a jury could find an enforceable oral agreement, and (2) even if a promise had been made to furnish Delaney with sufficient accounts to put him in a position to obtain a bonus

---

[12] The amount of his 2009 bonus compensation is alternatively described as $1.6 million, *see, e.g.*, Delaney Decl. ¶ 5, and $1.2 million, *see, e.g.*, Am. Compl. ¶ 27.  This discrepancy does not affect the Court's analysis.

equivalent to his 2009 bonus, as a matter of law, such a promise could not modify BoA's discretionary bonus plan or preclude it from terminating him, as an employee at will, in mid-year, before bonuses were paid.  Def. Br. 2, 17–18.

To make out a breach of contract claim under New York law, Delaney must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Eternity Global Master Fund v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted).   Where a plaintiff alleges the existence of an oral agreement, he "faces a heavier burden":  "To ensure that parties are not trapped into surprise contractual obligations that they never intended, more than agreement on each detail is required, there must be an overall agreement to enter into the binding contract."  *Bloch v. Gerdis*, No. 10 Civ. 5144 (PKC)(AJP), 2011 WL 6003928, at *3 (S.D.N.Y. Nov. 30, 2011) (quoting *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 293 (E.D.N.Y. 1998)).   As in all other contracts, oral contracts require definiteness:  "Before a court will impose a contractual obligation based on an oral contract, the proponent must establish that a contract was made and that its terms are definite."  *Muhlstock v. Cole*, 245 A.D.2d 55, 58 (1st Dep't 1997) (citing *Charles Hyman, Inc. v. Olsen Indus.*, 227 A.D.2d 270 (1st Dep't 1996)). "[F]or a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty."  *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982).  "The doctrine of definiteness or certainty is well established in contract law.  In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to. . . . [I]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."  *Dreyfuss v. eTelecare Global Solutions-US, Inc.*, No. 08 Civ. 1115 (RJS), 2008 WL

4974864 (S.D.N.Y. Nov. 19, 2008) *aff'd sub nom. Dreyfuss v. Etelecare Global Solutions-U.S. Inc.*, 349 F. App'x 551 (2d Cir. 2009) (summ. order) (quoting *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991)); *see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (citing *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999))).

A threshold question is to determine concretely the promise that Delaney contends BoA made to him. In his pleadings and submissions to the Court, Delaney has vacillated in his characterization of the agreement, including whether he was assured an amount of actual compensation or merely a "fair opportunity" to earn such compensation. In his Amended Complaint, Delaney alleges that BoA "agreed to assign him institutional accounts so that he would have a sufficient opportunity to compete for a share of the High Yield bonus pool that would exceed his 2009 bonus of approximately $1.2 million." Am. Compl. ¶ 27. In his Rule 56.1 submission, Delaney claims he "was told that he would not suffer financially from the change in his compensation structure." Pl. 56.1 ¶¶ 40–42. In his memorandum of law in opposition to BoA's motion for summary judgment, Delaney states that "he was promised that he would be given a fair opportunity to earn as much at the High Yield Desk as he had earned in Middle Markets." Pl. Br. 23. And at argument, Delaney's counsel acknowledged that "the only words that were stated [as to Delaney] is 'we'll take care of him.'" Tr. 49.

In reviewing the admissible evidence to determine if there is a basis on which a jury could find an enforceable promise made to Delaney, it is important to note that no witness other than Delaney testified that Delaney's internal transfer gave rise to any form of new agreement or

contract between him and BoA.  The decisive evidence is, therefore, Delaney's own testimony,

which he supplied both in a sworn deposition and a sworn declaration.[13]  The deposition and

declaration are not completely synchronous as to what Delaney's oral agreement with BoA

purportedly encompassed.  In his deposition, given on June 1, 2012, Delaney testified that he

was promised "[t]hat institutional accounts would be transferred to [his] account package."

Delaney Dep. 65.  In his sworn declaration, made on September 12, 2012, Delaney stated:  "[I]t

was agreed that my compensation would not suffer from the transfer because I would be awarded

sufficient accounts to generate production credits so that my compensation would remain at least

level and, hopefully, increase."  Delaney Decl. ¶ 11.  In these attestations, however, Delaney did

not state what BoA's specific obligations to him were under the purported oral agreement.  And,

importantly, when probed about this subject in his deposition, Delaney described the statements

upon which he inferred an oral agreement in elusive and vague terms, such as to preclude a

reasonable fact-finder from finding a promise sufficiently concrete to be enforceable.

        Importantly, in his deposition, Delaney did not aver that the purported promise was made

to him in a single conversation or by a single person at BoA.  Instead, Delaney testified that

before his transfer to High Yield, he had spoken separately with Amy Ellis-Simon, Jeff Fortgang,

---

[13] In his 56.1 statements, Delaney cites to several additional sources purportedly indicative of an
oral agreement.  *See* Pl. 56.1 ¶¶ 40–43 (citing four sources, apart from Delaney's own testimony,
ostensibly showing that "Delaney was told he would not suffer financially from the change in his
compensation structure and that the accounts would be sufficient to make him competitive").
None, however, supports an inference that BoA made a binding promise to Delaney.  *See*
Delaney Decl. Ex. 2 (email from Delaney to Ellis-Simon requesting that transfer not be
completed until he knew about his account package); Ellis-Simon Dep. 97 (stating that in
"normal times," there would be an expectation of greater compensation each year, but "these are
non normal times"); Honig Decl. Ex. 5 (in email to High Yield, Fortgang reports that he
"recently sat down with John Delaney and he assured me that he is comfortable and excited to be
joining the desk as an Institutional salesman"); Hollender Dep. at 185–86 (stating "[t]he
discussion was that over time we would try to move accounts to him," and "I just told John his
salary and bonus, like the rest of everybody [*sic*]").

and Steve Hollender, and that the promise on which he bases his contract claim emerged from these conversations taken as a whole. *See* Delaney Dep. 42–55; Tr. 46 ("It is the combination of Messrs. Fortgang and Hollender . . . that made that promise."). Delaney admits that "outside of that group of people, no, there were no other assurances made." Delaney Dep. 63–64. But as a review of Delaney's testimony about these conversations reveals, although a jury could find that there was discussion of additional accounts being transferred to him, no specifics were agreed upon—including as to which accounts would be transferred to him, the number of accounts to be transferred, when the accounts would be transferred, or what Delaney's ultimate compensation would be.

First, as to Delaney's conversation with Ellis-Simon, by Delaney's own admission, there was no mention at all in that conversation of a transfer of accounts. *Id.* at 42–47. Delaney did testify that he and Ellis-Simon discussed compensation, and that he indicated to her that he was interested in transferring back to High Yield "[b]ecause there was the opportunity to earn much greater income." *Id.* at 43. But this conversation, as related by Delaney, simply does not support his claim of a bargained-for exchange in which Delaney agreed to move to High Yield in consideration for a concrete promise by BoA.[14]

As to Fortgang, Delaney testified that they discussed the "obvious need for more institutional large accounts" to be added to Delaney's portfolio. But, Delaney admitted, he and

---

[14] For her part, Ellis-Simon testified that in her conversation with Delaney about moving to High Yield, she told him that "the movement into Institutional made more sense," given the size and composition of his accounts. Ellis-Simon Dep. 79–80. Although she opined to Delaney that the move would be "good for all," she testified that she "would never make predictions on compensation." *Id.* at 81; *see also id.* at 89–92 ("The only discussion we had is that John's first quarter in 2010 would be paid out per his inclusion in the Middle Market Sales team and that the balance or whatever discretionary bonus he will be eligible for would be decided on by Steve Hollender or Credit Management, Credit Sales Management, but he was subject as the rest of us were, to how that bonus pool got put together.").

Fortgang "did not get to the specifics of which accounts would be added," and the only

discussion of how many accounts would be added was "almost a tacit understanding that it

would be more than one."  Delaney Dep. 50.  Delaney also admitted that there was no

conversation regarding Delaney's overall level of compensation or his bonus in particular, let

alone regarding a guarantee of such a bonus.  *Id.* at 51.  Pressed on the point in his deposition,

Delaney added that Fortgang had told him "it's early in the process, but we will take care of

you."  *Id.* at 131.  Delaney testified that he subjectively understood that to mean:

> That I could trust in -- you know, in this case, in Jeff Fortgang and, you know,
> sales management to take care of me by way of, you know, bringing accounts to
> me on my list . . . . So there was an understanding that I would get, you know, a
> few of those kinds of accounts that would allow me to compete for commission
> for -- to compete on a sales production basis with other salesmen. . . . [T]herefore,
> it was understood that by my moving from middle markets to the high yield sales
> desk, or the institutional sales desk, that, you know, a handful of large accounts
> would be added to my account list.

*Id.* at 131–32.  However, when asked whether Fortgang had actually said those things to him or

whether Delaney had instead inferred them, Delaney stated that he had inferred them.  *Id.* at

133.[15]

Finally, Delaney's conversation with Hollender, as recounted by Delaney, also did not

contain a specific discussion of accounts to be added.  Instead, Delaney testified, the only

discussion was "within the context of I would need to have more accounts and institutional

accounts, you know, put on my account list."  *Id.* at 53–54.  Delaney also admitted that, as with

---

[15] Fortgang, for his part, testified that he "absolutely [did] not" discuss Delaney's total 2010
compensation:  "I had no idea how 2010 compensation was going to look at that time, I had no
idea where the market was going to be, where the firm was going to be, where we were going to
be. . . . [H]e would be put on a, he would be put on a salary bonus, the same way as everybody
else."  Fortgang Dep. 71–72.  As to the reason for Delaney's transfer, Fortgang noted that "we
were looking to phase out Middle Markets within the High Yield Institutional Desk."  *Id.* at 67.

Ellis-Simon and Fortgang, there was no discussion of how much he would be paid in a bonus or in total compensation.  *Id.* at 54–55.[16]

     Whether considered separately or together, these conversations do not come close to supplying a basis on which an enforceable contract could be found.  The statements that Delaney attributes to the BoA managers are far too indefinite to permit a fact-finder to determine what, if anything, BoA agreed to.  And Delaney's subjective inferences as to what one or more of these managers might have intended cannot establish an enforceable agreement:  A plaintiff's "statements of belief or understanding are immaterial in view of the well established principle that the controlling intention is that which is discerned from the parties' objective manifestation of agreement, not subjective, uncommunicated intentions or beliefs."  *Rosoff v. Mountain Laurel Ctr. for the Performing Arts*, 317 F. Supp. 2d 493, 499 (S.D.N.Y.2004); *see also United Res. Recovery Corp. v. Ramko Venture Mgmt., Inc.*, No. 07 Civ. 9452, 2009 WL 2746232, at *6 (S.D.N.Y. Aug. 28, 2009) ("Taken alone, Guttierez's vague and ambiguous statement that Kohut would be 'taken care of' is too indefinite to form a legally enforceable contract.").[17]

     Further, to the extent that Delaney might construe the BoA officials' statements to him as implicitly assuring him a bonus of a particular size, any such promise is inconsistent with BoA's

---

[16] Hollender summarized his conversation with Delaney and Fortgang as "[t]he discussion was that over time we would try to move accounts to him."  Hollender Dep. 185–86.  As to compensation, Hollender testified that he "just told John his salary and bonus, like the rest of everybody."  *Id.*

[17] Even if the Court were to find an agreement to furnish Delaney with some number of additional accounts, the evidence is undisputed that Delaney *did* receive new accounts.  He recalls two:  One account relationship (Mackay Pareto) that he asserts was impaired and another (Aberdeen Asset Management) that he asserts was too small.  Pl. 56.1 ¶ 35; Def. 56.1 ¶ 35; Delaney Decl. ¶¶ 12–13.  But because Delaney acknowledges receiving at least two new accounts, absent a finding of a more specific commitment by BoA as to the number or nature of accounts to be transferred, a reasonable juror could not find a breach of such an agreement.

written Incentive Plan for 2010, which squarely provided that bonuses were to be paid out entirely at the discretion of management.  Lamparello Aff. Ex. L, at 7.  Delaney argues that this written policy was tacitly modified by the BoA officials' oral statements to him.  Def. 56.1 ¶¶ 44–45; Pl. 56.1 ¶¶ 44–45.  However, courts have repeatedly held that "a written policy clearly stating that bonus compensation is discretionary bars breach of contract claims based on oral bonus promises."  *Buckman v. Calyon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 333 (S.D.N.Y. 2011); *see also id.* n.94 (collecting cases).  "It is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive."  *O'Shea v. Bidcom, Inc.*, No. 01 Civ. 3855 (WHP), 2002 WL 1610942, at *3 (S.D.N.Y. July 22, 2002) (citing *Culver v. Merrill Lynch & Co.*, No. 94 Civ. 8124 (LBS), 1995 WL 422203, at *3 (S.D.N.Y. July 17, 1995)).  Here, BoA expressly reserved "final authority" in determining bonuses for "management discretion."  Lamparello Aff. Ex. L, at 7.  Delaney's claim that an oral contract modified the Incentive Plan thus fails as a matter of law.

Finally defeating Delaney's claim is his status (which he does not dispute) as an at-will employee.[18]  Delaney was terminated before 2010 bonuses were to be paid out—they were not paid out until the first quarter of 2011.  Def. 56.1 ¶ 50, Pl. 56.1 ¶ 50.  BoA therefore argues that Delaney is not entitled to any damages, because it was free to terminate him before that date, and did so.  Def. Br. 23–24.  BoA is correct on this point, too.  Even if Delaney had been promised a certain number of accounts so as to assist him come bonus time, this promise did not protect him

---

[18] Delaney specifically disavows the notion that BoA's promise was a promise of employment. *See* Pl. Br. 22–23 ("Delaney does not claim that his status as an at-will employee changed, or that defendants could not terminate him (for a non-discriminatory reason) . . . ."); *see also* Tr. 26.

from being terminated before that point as part of a RIF, and Delaney has not offered any evidence of a promise to pay him a bonus in the event of a mid-year termination.

Accordingly, the Court holds that Delaney's contract claim fails as a matter of law.  In so holding, the Court recognizes that from Delaney's perspective, being terminated less than a year after his transfer into a new group, based on his inability to meet the group's production goals, may seem harsh.  But Delaney was an at-will employee whom BoA was entitled to terminate for any reason not proscribed by the law, and the ADEA "do[es] not permit courts to inquire about the wisdom or fairness of [a defendant's] business decisions, except insofar as those decisions may reflect impermissible discrimination." *Azzolini v. Alitalia Airlines*, No. 90 Civ. 3392 (LLS), 1991 WL 243380, at *5 (S.D.N.Y. Nov. 13, 1991); *see also Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1341 (1st Cir.1988) ("ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision does not stem from the person's age."); *Slatky v. Healthfirst, Inc.*, No 02 Civ. 5182 (JGK), 2003 WL 22705123, at *5 (S.D.N.Y. Nov. 17, 2003) ("The employer could terminate the plaintiff for a good reason, a bad reason, or no reason at all, so long as it was not a discriminatory reason. . . . Moreover, it is not for the Court to second-guess the business judgment for a termination, so long as there is no evidence that the reason for the decision was a pretext for discrimination.").

### D.  Delaney's Request for a Remand to FINRA

Delaney originally filed his contract claim with FINRA, pursuant to a mandatory arbitration agreement.  But after he brought the ADEA claim in this Court, the FINRA panel dismissed that claim in favor of its being litigated in this Court, alongside the ADEA claim.  Pl. Br. 24–25; Tr. 12–14, 20–24.  In his submissions to the Court at the summary judgment stage, Delaney asked that if the Court were to grant summary judgment to BoA on the ADEA claim, it

remand the contract claim to FINRA.  Pl. Br. 45–25.  BoA opposed that request.  It asked the

Court to exercise supplemental jurisdiction to reach—and dismiss—the contract claim.  BoA

argues that, with the parties having engaged in extensive discovery on this claim, it is efficient

and fair that the motion for summary judgment be resolved by the Court.  Def. Reply Br. 9–10;

Tr. 14–17.

     When determining whether to exercise supplemental jurisdiction, the Supreme Court has

instructed courts to consider "the values of judicial economy, convenience, fairness, and

comity."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *accord Hedges v. Town of*

*Madison*, 456 F. App'x 22, 24 (2d Cir. 2012) (summ. order).  Those values all point toward

retaining jurisdiction here.  Delaney's contract claim has been the subject of plenary discovery

and the parties' summary judgment motions have been fully briefed.  And this Court is well

familiar with the facts and record.  By contrast, were the Court to remand this claim to FINRA, a

new FINRA panel would have to be summoned; its members would have to gain familiarity with

the case; and the parties would likely need to modify their briefs to adapt to FINRA's format.

Judicial economy and convenience, therefore, overwhelmingly favor retaining jurisdiction.

Moreover, neither party is prejudiced by the Court's retaining jurisdiction, nor is there a comity

interest at stake:  There is no question of unsettled state law at issue here; instead the Court's task

has been to apply settled law to the facts.  In any event, even were the Court to remand, it would

be to FINRA—a non-governmental regulator—not to a state court.  The Court therefore has

found it appropriate to retain jurisdiction over Delaney's contract claim, and to grant summary

judgment for BoA.

**CONCLUSION**

For the reasons stated, defendants' motion for summary judgment is granted.  The Clerk

of Court is directed to terminate the motion pending at docket number 25 and to close this case.


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: December 11, 2012
       New York, New York

32